# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3842 | **DATE** | 9/19/2003 |
| **CASE TITLE** | Frank Richter vs. Village of Oak Brook, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendants' motion for summary judgment (Doc. No. 35-1) is granted. Judgment entered in favor of Defendants and against Plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | **2** number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | SEP 2 2 2003 date docketed |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | 9/19/2003 date mailed notice |
| ETV | courtroom deputy's initials | |

U.S. DISTRICT COURT
C.L.E.R.K.
03 SEP 19 PM 4:59
FILED
Date/time received in central Clerk's Office

Document Number

53

ETV
mailing deputy initials

FRANK RICHTER, )
)
      Plaintiff )
)
    v. )    No. 01 C 3842
)
VILLAGE OF OAK BROOK, VILLAGE )    Judge Rebecca R. Pallmeyer
MANAGER, STEPHEN VEITCH and )
FIRE CHIEF DEBRA JARVIS, )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Frank Richter ("Richter") is on sick leave from his position as a firefighter with the

Village of Oak Brook ("the Village"). He believes he has been treated shabbily by the Village's Fire

Chief, Debra Jarvis ("Jarvis"), and Village Manager Stephen Veitch ("Veitch") in retaliation for his

exercise of his First Amendment right as a public employee to comment on health and safety

concerns at the Village's fire stations. Richter filed this action alleging that Defendants violated 42

U.S.C. § 1983 based on deprivations of his First and Fourteenth Amendment rights. The court

earlier denied a motion to dismiss based on qualified immunity, *see Richter v. Village of Oak Brook*,

No. 01 C 3842, 2001 WL 1519423 (N.D. Ill. Nov. 29, 2001), but now concludes that Plaintiff has

come forward with no evidence that would support a reasonable jury's conclusion that Defendants'

challenged actions were motivated by his First Amendment activity.

## FACTUAL BACKGROUND

Frank Richter has been employed by the Village Fire Department ("the Department") as a

firefighter since 1985. In his 18 years with the Department, Plaintiff has also acted, at various

times, as part-time fire inspector and Chief Union Steward. He remains employed as a firefighter

on light duty status and continues to serve as Chief Union Steward. (Defendants' 56.1 Statement

(hereinafter "Defs.' 56.1") ¶¶ 1, 2, 22; Richter Deposition (hereinafter "Richter Dep."), Ex. A to

Plaintiff's 56.1 Statement (hereinafter "Pl.'s 56.1"), at 6, 8, 14.) The duties of a Village firefighter who is not on light duty status include responding to the scene of a fire, handling the fire hose, and various firehouse duties–keeping the living area tidy and generally ensuring firefighters' ability to respond to calls for rescues and fighting fires. (Richter Dep., at 14-15.) The duties of a Village firefighter on light duty status include clerical tasks, answering phones, assisting with filing, and general office work at the Department. (Defs.' 56.1 ¶ 24; Jarvis Deposition (hereinafter "Jarvis Dep."), Ex. D to Pl.'s 56.1, at 226.)

**Plaintiff's Role as Union Steward**

Since approximately 1996, Plaintiff has acted as the Chief Union Steward for Teamsters Local 714 ("the Union"), which represents firefighters in collective bargaining with the Department. (Defs.' 56.1 ¶ 2; Richter Dep., at 8.) The parties disagree regarding the extent of the Chief Union Steward's involvement with health and safety issues, a question they deem crucial to this court's determination whether Plaintiff's speech addressed a matter of public concern.[1] As explained in the Collective Bargaining Agreement ("CBA"), "[t]he Chief Union Steward shall be deemed the Union's official spokesperson."[2] (CBA, ex. L to Pl.'s 56.1, at 8.) Under the CBA, either the Union Steward or the Chief is authorized to request a meeting to discuss matters of mutual concern, including safety issues. (*Id.* at 9.) The CBA does not, however, direct that employees raise health and safety concerns with the Chief Union Steward; instead, it states that employees "shall immediately inform their supervisor" who will then determine what action, if any, should be taken

---

[1]    As discussed *infra*, however, in this court's view, the more significant issue is not whether Plaintiff's Union duties involve health and safety issues, but whether Plaintiff made his statements regarding health and safety in the "routine discharge" of his employment responsibilities.

[2]    Oddly, neither party cited this provision in their Rule 56.1 Statements.

2

concerning such issues.[3] (*Id.* at 71.) In an April 18, 2002 letter to Plaintiff, Thomas Walsh ("Walsh"), Business Agent for the Union, responded to Plaintiff's request for the Union's definition of the role of Chief Steward: "The Chief Steward protects the jobs and welfare of fellow members through the negotiations and grievance processes and uses leadership skills to build the Local." (Ex. M to Pl.'s 56.1.) Defendants contend that the Union Steward is "responsible for the health and safety of his fellow members," (Defs.' 56.1 ¶ 5), and Plaintiff acknowledges that his duties as Union Steward "at all times, involve[] health and safety oversight at the Department." (First Amended Complaint (hereinafter "Amend. Compl.") ¶ 14.) He asserts, however, that his responsibilities in the area of health and safety are limited to issues involving the negotiations and grievance processes. (Pl.'s 56.1 ¶ 5.) It is undisputed that, in addition to his duties as a line firefighter and as Union Steward, Plaintiff also serves as a part-time fire inspector in his off-duty time at Fire Station One.[4] (Jarvis Dep., at 226-227.)

Plaintiff claims that he was "the most vocal, persistent, and diligent spokesman" on the issue of air quality in the stations and that it was his "outspoken efforts" to have the Department address his concerns regarding air quality in both stations that prompted the Village to take action

---

[3]     The provision states:

Section 16.8. Safety and Unsafe Conditions. Employees who reasonably and justifiably believe that their safety and health are in danger due to an alleged unsafe working condition or equipment not inherent with their customary duties, shall immediately inform their supervisor who shall have the responsibility to determine what action, if any, should be taken, including whether or not the job and/or the unsafe condition should be discontinued.

Surprisingly, neither party cited this provision.

[4]     The record does not indicate how or when Plaintiff became a part-time fire inspector. Jarvis stated in her deposition testimony that Plaintiff "was made the part-time fire inspector prior to [Jarvis's] coming on as the Chief." (*Id.* at 227.) Jarvis testified that she became Chief in 1997. (*Id.* at 31.) The record also lacks any reference to the duties of a Village fire inspector, and neither party explains whether Plaintiff's role as fire inspector imposes any limits on his First Amendment rights.

with respect to the air quality in Station Two. (Pl.'s 56.1 ¶¶ 68-69; Kovarik Deposition (hereinafter "Kovarik Dep."), Ex. E to Pl.'s 56.1, at 57; Brazel Deposition (hereinafter "Brazel Dep."), Ex. F to Pl.'s 56.1, at 59-60; Morton Deposition (hereinafter "Morton Dep."), Ex. J to Pl.'s 56.1, at 59-60; Richter 12/10/96 Mem. to Crotty, Ex. T to Pl.'s 56.1.) Apart from what the court has ascertained, described in the following pages, Plaintiff neither explains the nature of his "outspoken efforts" or of the Village's "action" nor demonstrates that these "efforts" predated the Village's "action."

Plaintiff did raise concerns about the air quality in Village fire stations in two memos to Assistant Village Manager Michael Crotty ("Crotty"). First, in a December 20, 1996 memo, Plaintiff confirmed an earlier conversation with Crotty about the problem of diesel exhaust being drawn into the living quarters at the stations. (Ex. HH to Pl.'s 56.1.) He noted that "this problem has been brought to my attention by numerous department officers, firefighter personnel and nonunion employees. Please advise on a solution to correct this potentially serious problem." (Id.) In a November 20, 1998 memo to Crotty, Plaintiff stated that he had not seen any attempt by the Village to correct the poor air quality situation since the time he sent his first memo almost two years earlier. (Id.) He stated that he felt this "slow corrective process" was "unacceptable when involving the safety, health and well being of all employees." (Id.) He then stated that on November 4, he had questioned the continued use of a fire blanket that was still being used in a squad, even though a test had revealed "80% asbestos chrysotile particles" and stated that, although the blanket had been removed, "we won't be sure on how this will effect [sic] the future health of all effected [sic] personnel, but this must be documented." (Id.)

Whether and how these memoranda are related to the Village's efforts to address air quality is disputed. (Defs.' 56.1 ¶¶ 3-4; Pl.'s 56.1 ¶¶ 3-4.) Defendants claim that, as early as 1997, the Village planned to install exhaust recapture devices in the stations, and that, on a date not disclosed in the record, it did install one exhaust recapture system in an unspecified fire station. (Defs.' 56.1 ¶¶ 3-4; Ex. D to Defs.' 56.1; Crotty Deposition (hereinafter "Crotty Dep."), Ex. I to Pl.'s

56.1, at 16-17; Veitch Deposition (hereinafter "Veitch Dep."), Ex. H to Pl.'s 56.1, at 26-27; Nelson

Deposition ("hereinafter "Nelson Dep."), Ex. B to Pl.'s 56.1, at 47; Jarvis Dep., at 46-49; Brazel

Dep., at 53.) Plaintiff alleges that the exhaust removal system was not budgeted in 1997 and that

"[n]o improvements were made to Station One for diesel emissions from the apparatus." (Pl.'s 56.1

¶¶ 3-4; Veitch Dep., at 27; Brazel Dep., at 54.) In its 1998 and 1999 Five Year Financial Plans, the

Village budgeted $25,000 for "Exhaust Removal System." (Ex. D to Defs.' 56.1.) Notwithstanding

the parties' dispute on this issue, the timing and nature of the budgeting and installation of exhaust

recapture devices are not material to Plaintiff's claim that he suffered adverse action as a result of

his exercise of his First Amendment rights.

**Plaintiff's Disciplinary History**

The Department uses a progressive discipline procedure for firefighters, in which discipline

is imposed in stages. (Pl.'s 56.1 ¶ 42.)[5] An oral reprimand constitutes the lowest level of

progressive discipline under the union contract. (Defs.' 56.1 ¶ 17; Jarvis Dep., at 260-62.)

Discipline at the verbal warning stage is memorialized in a written document, which is placed in the

employee's personnel file as a reference point against which any future discipline can be gauged.

(Pl.'s 56.1 ¶ 44.) A written warning constitutes the next step in the progressive discipline

procedure. (Id. ¶ 43.) Under the CBA, a verbal warning is void after 18 months. (Defs.' 56.1 ¶ 18.)

On December 3, 1998, several days after Plaintiff's second memo to Crotty, Jarvis issued

a verbal warning to Plaintiff.[6] (Pl.'s 56.1 ¶ 40.) On December 4, 1998, Jarvis met with Plaintiff

---

[5]     Defendants dispute Plaintiff's factual assertions regarding the verbal warning he
received on December 3, described *infra*, and all related factual assertions, arguing that any claim
dating back to December 1998 is time-barred. (*See* Defs.' Opp. 56.1 ¶¶ 40-46.) Defendants have
offered no evidence to contradict Plaintiff's assertions concerning progressive discipline, however,
and the court deems these assertions admitted.

[6]     Plaintiff's 56.1 does not indicate why Jarvis issued the verbal warning. Also,
although Plaintiff's statement of facts asserts that Jarvis issued the verbal warning on December
3, Plaintiff's response to Defendants' brief indicates the reprimand was issued on December 4.
(continued...)

regarding the verbal warning. (Jarvis 12/9/98 Mem., Ex. R to Pl.'s 56.1.) On December 5, 1998, Plaintiff outlined a written rebuttal to Jarvis's verbal reprimand and addressed it to Walsh. (Richter 12/5/98 Mem. to Walsh, Ex. S to Pl.'s 56.1.) Plaintiff then handed the memo to Jarvis.[7] (Jarvis 12/9/98 Mem.) On December 9, 1998, Jarvis sent a memo to Plaintiff, with a copy to Captain Joseph Kovarik ("Kovarik"), Plaintiff's shift commander from September or October 1997 through February 3, 2000, stating, "Please keep in mind that if you respond to me in writing rather than with the verbal response agreed to in our December 4th meeting, then the verbal warning will, in essence, become a written reprimand." (Pl.'s 56.1 ¶ 41; Jarvis 12/9/98 Mem.) Plaintiff maintains that nothing in the Department's policy suggests that an employee's written response to verbal discipline will result in escalation of a verbal warning to a written reprimand, but that Jarvis's memo shows she took precisely that action. (Pl.'s 56.1 ¶¶ 43, 45.) Plaintiff alleges that Jarvis escalated his verbal warning to a written reprimand both because Plaintiff submitted a written response to Jarvis's verbal warning and because of his efforts to convince the Village President, Jarvis's superior,[8] to address his concerns regarding air quality issues in the Department. (Id. ¶¶ 43, 46; Jarvis 12/9/98 Mem.; Richter 12/5/98 Mem. to Walsh; Kovarik Dep., at 12; Richter 12/4/98 Mem. to Crotty, Ex. HH to Pl.'s 56.1; Walsh Deposition (hereinafter "Walsh Dep."), Ex. C to Pl.'s 56.1, at 21-22.) Kovarik testified in his deposition that he was not aware that a written rebuttal to the Chief would automatically escalate an oral reprimand to a written reprimand, but "that was what the Chief

_____

[6](...continued)
(Compare Pl.'s 56.1 ¶ 40 to Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment, at 8.)

[7]      Jarvis's December 9, 1998 memo to Plaintiff begins, "I am returning the original memo to you that you handed me this week. I believe you may have given it to me in error. It appears to be an original memo from you to Tom Walsh regarding our December 4th meeting regarding your verbal warning." The memo does not indicate the date on which Plaintiff handed the memo to Jarvis.

[8]      The record does not indicate who the Village President was during this period.

6

was stating"[9]; he did not mention Jarvis's motivation. (Kovarik Dep., at 12.) Walsh testified in his deposition that he recalled Plaintiff telling him that, when the air quality issue first arose, Plaintiff went over Jarvis's head and complained to the village president rather than to Jarvis, and that Jarvis was going to discipline him for going outside the chain of command. (Walsh Dep., at 21-22.) Plaintiff has not, however, offered any non-hearsay evidence regarding Jarvis's motivation for her December 9 memo.

## Plaintiff's Health and Safety Complaints

On December 9, 1998, Plaintiff filed a complaint with the Illinois Department of Labor ("IDOL") regarding his concerns about air quality in the stations.[10] (Pl.'s 56.1 ¶¶ 8, 75-77; Plaintiff's IDOL Complaint (hereinafter "Pl.'s IDOL Compl."), Ex. N to Pl.'s 56.1.) In the complaint, Plaintiff described the hazardous conditions as 1) poor air quality at both stations, 2) a fire blanket containing 80% chrysotile asbestos particles and "possible rescue squad still being contaminated,"[11] and 3) a minimum of thirty-three affected employees.[12] (Pl.'s 56.1 ¶ 77; Pl.'s IDOL Comp.) At some point (the date is not specified in the record), Plaintiff communicated with Doug Nelson, IDOL Northern Illinois Manager for the Safety Division. (Pl.'s 56.1 ¶ 75; Nelson Dep., at 6-7.) During an inspection (the date of which is not disclosed in the record), Captain John Brazel

---

[9]      It is unclear from Kovarik's deposition whether the phrase "that was what the Chief was stating" referred to Jarvis's statement in the December 9 memo to Plaintiff or whether Kovarik was describing a statement Jarvis made about automatic escalation at some other time.

[10]      Plaintiff's 56.1 refers to an inspection by "OSHA." (Pl.'s 56.1 ¶ 79.) Plaintiff explained in his deposition testimony, however, that IDOL "is OSHA – they call it the Illinois OSHA. We don't have OSHA in Illinois . . . . Illinois uses IDOL, which . . . follow[s] OSHA guidelines." (Richter Dep., at 145-46.) Thus, it appears that Plaintiff uses IDOL and OSHA interchangeably in his deposition and briefs.

[11]      The record does not indicate what Plaintiff meant by the expression "possible rescue squad still being contaminated."

[12]      The complaint did not identify any of the minimum thirty-three allegedly affected employees, or in what way they were affected.

("Brazel") started an engine to demonstrate the extent of the diesel exhaust problem at the stations, but Chief Nielsen ordered him to shut down the engine immediately.[13] (Pl.'s 56.1 ¶ 79; Brazel Dep., at 53.)[14] Plaintiff also contacted the National Institute for Occupational Safety and Health ("NIOSH") regarding air quality in the stations.[15] (Pl.'s 56.1 ¶ 8; Richter Dep., at 145.) Again, the parties dispute the capacity in which Plaintiff voiced these complaints, an issue they deem important to determining whether Plaintiff's speech was constitutionally protected because it came within the scope of the assigned duties of the Union Steward. Defendants claim that Plaintiff both acted and identified himself as "Union Steward" or "Chief Union Steward" when he contacted these outside agencies. (Defs.' 56.1 ¶¶ 7-8.) Plaintiff denies this contention, noting that, in his IDOL Complaint, he identified himself as "a representative of employees" and stated that he served as representative through the Union. (Pl.'s 56.1 ¶¶ 7-8.)

At some point (again, the date is not disclosed), Plaintiff contacted John Dimos ("Dimos"), Director of Occupational and Environmental Hygiene Services at the University of Illinois at Chicago, to inform him that he had urged the Village to discuss the air quality problems in the stations with Dimos. (Pl.'s 56.1 ¶¶ 70-71; Dimos Deposition (hereinafter "Dimos Dep."), Ex. K to Pl.'s 56.1, at 8.)[16] Dimos conducted a walk-through air quality evaluation of the stations in early

---

[13]    Brazel testified, "OSHA was here doing an inspection one time. We started up the engine. We were ordered to shut it down right away. We were trying to make it obvious to the OSHA inspectors it was a problem." (Brazel Dep., at 53.)

[14]    As mentioned *supra*, Defendants dispute this assertion on the basis that it is "immaterial and irrelevant to the subject litigation," (*See* Defs.' Opp. 56.1 ¶ 79), but they do not offer evidence to rebut this assertion and the court deems it admitted.

[15]    The record does not indicate when Plaintiff contacted NIOSH or with which NIOSH employee(s) he communicated. (*See* Pl.'s 56.1 ¶ 8.)

[16]    Defendants dispute several factual assertions in Plaintiff's 56.1 on the basis that they are "immaterial and irrelevant to the subject litigation," (*See* Defendants' 56.1 Statement in Opposition to Plaintiff's Statement of Additional Facts ¶¶ 70-73, 78-80, 93, 107), but they do not offer evidence to rebut these assertions and the court deems them admitted.

January 1999, although it is not clear from the record whether Dimos or the Department initiated contact. (Dimos Dep., at 12.) On January 28, 1999, Dimos submitted a proposal to Lieutenant Robert Morton ("Morton") to perform an evaluation of indoor air quality and ventilation systems for diesel emissions in both station houses. (Ex. 2 to Dimos Dep.) On a date not specified in the record, the Department accepted Dimos's proposal, and he conducted the testing and evaluation on April 14, 1999. (Pl.'s 56.1 ¶ 73; Dimos Dep., at 11.) As of that date, both stations were equipped with exhaust fans, but no vehicle exhaust capture systems were in place at either station. (*Id.*) Dimos submitted the report of his findings to the Village on May 21, 1999. (Dimos Dep., at 13.) Although Dimos testified in his deposition that his proposal included the costs that the Village would incur (*id.* at 12), the record does not indicate whether the Village ultimately paid for the study.

## Performance Appraisals

Each firefighter employed by the Department is given an annual performance appraisal; based on this evaluation, the firefighter may receive a bonus at the end of his anniversary year. (CBA, at 44.) Kovarik conducted Plaintiff's 1997 through 1999 annual performance appraisals. (Pl.'s 56.1 ¶¶ 33-35; Kovarik Dep., at 6-8.) On January 1, 1998, and January 1, 1999, Plaintiff received an overall performance rating of "Excellent," the highest possible rating, and a concomitant bonus of $1000, for the years 1997 and 1998, respectively. (Pl.'s 56.1 ¶¶ 36-37.) On January 1, 2000, Plaintiff's performance rating was "Above Standards" and, as a result, he received a $300 bonus, for the year 1999. (*Id.* ¶ 38.) In particular, Plaintiff received a "Below Standards" evaluation for the performance function marked "Attitude." (Pl.'s 56.1 ¶ 39.) The appraisal contains Kovarik's December 23, 1999 signature as Reviewer with comments, Jarvis's December 28, 1999 signature as Reviewer's Supervisor with comments, Plaintiff's December 23, 1999 signature as Employee with comments, and Veitch's December 30, 1999 signature as Village Manager. (1999 Performance Appraisal (hereinafter "1999 Appraisal"), Ex. Q to Pl.'s 56.1, at 4.)

9

Kovarik's comments state, "Frank is very pro Training and pro safety and would be an even greater asset to this dept. if he could focus his attention better to the needs of the daily schedule." (*Id.*) Jarvis's comments state, in part, "With regard to #6 [Attitude] Frank does spend too much on duty discussing union matters. I concur with Capt. Kovarik's assessment and reiterate union business and conversations should be conducted off duty." (*Id.*)

Citing Kovarik's deposition testimony and the appraisal itself, Plaintiff claims that Kovarik consulted with Morton and Jarvis in preparing this appraisal, and that the basis for his score in the "Attitude" category was Jarvis and Kovarik's "undocumented contention" that Plaintiff spent too much time discussing union matters while on duty. (*Id.* ¶¶ 35, 39; Kovarik Dep., at 7-8; 1999 Appraisal, at 2, 4.) Defendants dispute this contention, claiming that Kovarik testified that "his performance appraisals contain his words and his words alone," and that "he gave Plaintiff a below standard evaluation on his own initiative and without any urging or input from Chief Jarvis." (Defs.' Opp. 56.1 ¶¶ 35, 39; Kovarik Dep., at 7-8, 22-24.) Kovarik did acknowledge that he consulted with Morton in conducting Plaintiff's 1999 Performance Evaluation regarding Plaintiff's job performance, including whether he had been attending classes, since Kovarik worked at a different station; talked with Jarvis regarding any discipline Plaintiff had received; and looked at his personnel file. (Kovarik Dep., at 7-8, 22.) Kovarik testified that he then "put it all together with my knowledge" and wrote the evaluation in his own words, whether or not Jarvis agreed with him. (*Id.* at 8.)

**Safety Committee**

The parties dispute whether Plaintiff was a member of the Department Safety Committee ("the Committee"). The record indicates that, in or around the month of January 2000,[17] at an officers' meeting, Chief Jarvis asked the officers "for one person from [each] shift to be a rep."

---

[17]    Plaintiff testified in his deposition that Brazel selected him to serve on the Committee "in approximately January of 2000." (Richter Dep., at 17.)

(Brazel Dep., at 26.) After the meeting, Brazel, who was Plaintiff's supervisor at the time,[18]

approached Plaintiff and asked if he would be interested in being the representative for his shift,

and Plaintiff said he would be interested. (*Id.*) It is undisputed that Brazel then stated, "Okay[,

t]hen you can be our representative." (Pl.'s 56.1 ¶ 82; Defendants' 56.1 Statement in Opposition

to Plaintiff's Statement of Additional Facts (hereinafter "Defs.' Opp. 56.1") ¶ 82; Brazel Dep., at 26.)

The parties also agree that Brazel appointed Plaintiff to the Committee. (Pl.'s 56.1 ¶ 82; Defs.'

Opp. 56.1 ¶ 82.) It is also undisputed that at some point thereafter, Chief Jarvis ordered Brazel to

replace Plaintiff as the representative on the Committee with another candidate on his shift.[19] (Pl.'s

56.1 ¶ 83; Defs.' Opp. 56.1 ¶ 83.) The parties dispute both the significance of and motivations for

these events. Plaintiff contends that he actually served as a "member" of the Committee, pointing

to Brazel's aforementioned testimony and to Plaintiff's own deposition testimony in which he states

that he "was to be on the safety committee for our shift." (Pl.'s 56.1 ¶ 10; Brazel Dep., at 26-27;

Richter Dep., at 16-17.) Defendants' 56.1 Statement argues that Plaintiff was never actually a

member of the Committee, citing Morton's deposition, in which he testified that he did not recall

Plaintiff being part of the Committee; Plaintiff's deposition testimony, in which he testified that he

was never called to attend a Committee meeting, even though he knew one had taken place in the

---

[18] As noted *supra*, Plaintiff claims that Kovarik was his supervisor from September or October 1997 through February 3, 2000. Thus, there is an apparent overlap during the period January 2000 through February 3, 2000 when Brazel and/or Kovarik may have been Plaintiff's supervisor. In his deposition testimony, Plaintiff expressed uncertainty as to this apparent overlap and stated that he was unable to recall at what point Captain Brazel became his supervisor or whether another Captain (Fleishman) replaced Kovarik as his supervisor prior to Brazel. (Richter Dep., at 123-125.) Because Defendants do not dispute Plaintiff's chronology of this matter, however, the court assumes these events took place in the manner in which Plaintiff describes them. The record does not indicate whether Brazel is still Plaintiff's supervisor.

[19] The parties' 56.1 Statements do not indicate the date on which Jarvis ordered Brazel to select another candidate as shift representative to the Committee. In his amended complaint, Plaintiff alleged that, "in November 2000, Chief Jarvis removed Plaintiff from the Department Safety." (Amended Compl. ¶ 17.) Brazel testified in his deposition that, "At the next officers' meeting, I told the Chief that Frank Richter was going to be our shift representative and she asked me to name someone else to that position." (Brazel Dep., at 26.)

spring or summer of 2000; and Jarvis's deposition, in which she testified that Plaintiff was never a "safety liaison."[20] (Defs.' 56.1 ¶ 10; Morton Dep., at 49, 125-26; Richter Dep., at 21; Jarvis Dep., at 94-98.) Defendants' brief, however, states that "Plaintiff's reports as Chief Union Steward for the Village . . . and as a *member* of the Fire Department Safety Committee do not involve speech that is a matter of public concern . . . ." (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (hereinafter "Defs.' Mem."), at 3 (emphasis added.) Plaintiff contends that "Chief Jarvis refused to permit Plaintiff to serve as a representative on the Fire Department Safety Committee in retaliation for Plaintiff's outspoken efforts to expose air quality problems in the fire stations." (Pl.'s 56.1 ¶ 87.) Plaintiff has no non-hearsay evidence to support his assertion, however; he points only to his own deposition testimony that his claim about Jarvis's motivation was based on his "feeling." (Richter Dep., at 58-59.)

### Additional Complaints about Fire Station Air Quality

In a May 31, 2000 memo to Jarvis, Plaintiff stated his belief that information on the chemicals to be used to prepare and complete the sealing of the floor in Station Two "reflects possible health issues, which should be addressed prior to the upcoming floor-resurfacing project . . . . I feel it is most imperative that we meet on what may be a mutual health concern for both the Village and the Union." (Ex. 52 to Jarvis Dep.) In a September 9, 2000 memo to Jarvis regarding the testing and removal of asbestos, Plaintiff asked that he be present "as Safety Representative for the Union, during the scheduled process." (Ex. 39 to Jarvis Dep.) He also expressed his hope that "a policy will be set forth to inform employees in the future whenever the Village becomes aware of situations that may affect their health and well-being." (*Id.*) Plaintiff wrote another memo to Jarvis on the same day in which he indicated that amosite asbestos had been found in the

---

[20]     The record does not indicate whether the terms "shift representative," "member," and "safety liaison" are interchangeable with respect to the Committee. Because the parties appear to use the term interchangeably, the court assumes the terms are synonymous and that, in any event, that any distinctions do not create an issue of material fact.

insulation on the generator exhaust system in Station Two, "which raises a question of possible serious future health concerns of those employees exposed." (Ex. 41 to Jarvis Dep.) In an October 7, 2000 memo to Jarvis, Plaintiff stated that he had been informed of "additional mold found growing in the downstairs storage areas at Station 1 . . . . This may explain the increased sensitivity expressed by two individuals, who have already been exposed to the combination of diesel and mold at both stations." (Ex. 48 to Jarvis Dep.) Plaintiff testified in his deposition that he himself was one of the two individuals he referred to in this memo. (Richter Dep., at 39.) On November 21, 2000, Plaintiff sent a letter to Al Juskenas of IDOL requesting that his office follow up on his question whether his request "that an agency determine all the types of mold that exist" had been carried out. (Ex. 42 to Jarvis Dep.)

When a firefighter suffers an injury on the job that does not require formal medical attention, he submits an "IRMA[21] Incident/First Aid Report" ("IRMA Report") to Captain Brazel. (Defs.' 56.1 ¶ 12; Crotty Dep., at 22; Brazel Dep., at 7.) Brazel signs the IRMA Report and then submits copies to the Fire Chief, the Finance Department, the Village Safety Committee, and the firefighter's personnel file. (Brazel Dep., at 7.) The Chief and members of the Village Safety Committee review the report to determine whether there are safety issues that need to be addressed. (Defs.' 56.1 ¶ 19.) In his deposition testimony, Brazel stated that the purpose of the IRMA Report is to keep track of the injury, whether the Department member received treatment, and the seriousness of the injury, as well as to document that it happened on the job. (Brazel Dep., at 8-9.) Defendants rely on Brazel's testimony as support for their contention that the reports must reflect "what specifically caused the injury." (Defs.' 56.1 ¶ 20; Brazel, p. 8-9.) Plaintiff contends that Department policy regarding reports merely requires firefighters to state their opinions as to the cause of their

---

[21]    Although the record does not explain the derivation of the term "IRMA," the court assumes, based on the address provided on the report form, that the acronym refers to the Intergovernmental Risk Management Agency, an Illinois municipal risk pool headquartered in Oakbrook Terrace, Illinois.

symptoms and to document that the injury occurred while on the job, also citing Brazel's deposition.[22] (Pl.'s 56.1 ¶ 20; Brazel Dep., at 8-9, 61-62.) Brazel stated that the firefighters submit these forms based on their opinions as to what is causing their problems, and that the Department does not regard the IRMA reports as the conclusive statement on the cause of illnesses. (Brazel Dep., at 61-62.)

On October 7, 2000, Plaintiff submitted to Brazel an IRMA Report in which he stated only that he had suffered "chronic exposure to mold(s) and/or diesel exhaust causing increased respiratory problems." (Defs.' 56.1 ¶ 11; Brazel Dep., at 16-18; Richter Dep., at 44-46; Ex. 8 to Richter Dep.) On October 9, 2000, Jarvis wrote a memo to Plaintiff informing him that she was rejecting his IRMA Report because it lacked specific facts regarding the incident and contained his conclusions regarding the cause of the injury. (Defs.' 56.1 ¶¶ 13-14; Ex. 9 to Richter Dep.) Jarvis asked Plaintiff to complete a new report and submit it to Brazel. (Ex. 9 to Richter Dep.)

On January 20, 2001, Plaintiff submitted a second IRMA Report in which he stated that he had suffered an "adverse reaction to existing exposure problem w/ sick bldg syndrom [sic]" which caused "an already sensatized [sic] chronic respiratory condition to become more compromized [sic], w/ increased phlem [sic] feverish irritability w/ maintenance meds on board." (Defs.' 56.1 ¶ 16; Ex. R to Defs.' 56.1.) On January 25, 2001, Jarvis wrote a memo to Plaintiff in which she stated that he had again failed to describe specifically the facts of his injury and that he had again improperly drawn conclusions as to his condition. (Ex. T to Defs.' 56.1.) The memo stated, "This memo shall serve as a verbal warning to you for improper completion and submission of fire department paperwork." (Id.) The memo warned that failure to complete future paperwork properly "could result in further discipline up to and including termination." (Id.) The parties agree that submitting an IRMA Report in the manner in which Plaintiff drafted his memos would not typically

---

[22] Neither party has cited to any written statement of Department policy regarding IRMA reports.

warrant discipline in the form of termination, though they do not address whether it was standard practice for an employee to receive a written warning for such an offense. (Pl.'s 56.1 ¶ 90; Defs.' Opp. 56.1 ¶ 90.)

## Sick Leave and Light Duty Assignment

In November 2001, Plaintiff was out of work due to a shoulder injury when Jarvis ordered Plaintiff to return to work on a light duty assignment.[23] (Pl.'s 56.1 ¶ 99; Richter Dep., at 86.) Plaintiff complied with this request and returned to work.[24] (Pl.'s 56.1 ¶ 100.) Plaintiff's physician, Dr. Gregory Bussell, examined Plaintiff after he returned to light duty work and concluded that his respiratory symptoms had returned.[25] (Pl.'s 56.1 ¶ 101; Richter Dep., at 138.) Dr. Bussell wrote a letter stating that Plaintiff was not to work in areas in which he would be exposed to the air in the stations. (Id. ¶ 102.) In order to avoid exposure to the air in the stations, Plaintiff asked Jarvis to permit him to perform fire inspection duties "in lieu of, or as a form of, light duty work" in the stations; Jarvis denied this request. (Pl.'s 56.1 ¶¶ 103-104.) The parties agree that Jarvis had adopted an unwritten policy that no firefighter could work for the fire inspection service or perform other part-time work while on light duty status. (Pl.'s 56.1 ¶ 116; Defs.' Opp. 56.1 ¶ 116.) Defendants claim Jarvis denied Plaintiff's request pursuant to this policy. (Defs.' Opp. 56.1 ¶ 105;

---

[23]     The record does not indicate how or when Plaintiff's shoulder injury occurred, or when Jarvis ordered him to return to work.

[24]     The record does not indicate when Plaintiff returned to work.

[25]     Defendants do not dispute that this was Dr. Bussell's opinion. (Defs.' Opp. 56.1 ¶ 101.) Although Plaintiff's 56.1 Statement states that Dr. Bussell determined his symptoms had "returned," Plaintiff testified in his deposition that Dr. Bussell told him that "everything's starting to come back and reoccur." (Richter Dep., at 138.) The record does not include testimony from, or medical records written by, Dr. Bussell. It is unclear from the record whether these symptoms were the same ailments from which Plaintiff claimed to have suffered when he completed his initial IRMA Report in October 2000. (See Ex. 8 to Richter Dep.) The record does not indicate with what frequency, if any, Plaintiff experienced these symptoms either before he filed his initial IRMA Report or between that time and November 2001. Nor does the record indicate whether he took any sick leave because of this condition prior to November 2001. Plaintiff refers to his continuing symptoms as a "condition" or "sensitivity due to the exposure problem." (See Richter Dep., at 137.)

Jarvis Dep., at 227-28.) The record does not indicate whether Jarvis or anyone else at the Department ever enforced this unwritten policy with regard to any other firefighters, but Plaintiff believes that Jarvis denied his request not because of his safety-related speech but because he had filed an unfair labor practice charge to prevent part-time fire inspection jobs from being given to contract employees. (Pl.'s 56.1 ¶ 105.) He testified that Jarvis told him that was why she was denying his request.[26] (Pl.'s 56.1 ¶ 105; Richter Dep., at 145.)

On November 16, 2001, Plaintiff left work and went on sick leave. (See Pl.'s 56.1 ¶ 106; Defs.' Opp. 56.1 ¶ 106.) On December 6, 2001, Plaintiff underwent surgery on his shoulder. (Pl.'s 56.1 ¶ 107; Defs.' Opp. 56.1 ¶ 107.) On or about January 10, 2002, Plaintiff's orthopaedic doctor released Plaintiff to light duty status, Jarvis sent Plaintiff a letter ordering him to return to work on light duty assignment, and Dr. Bussell wrote another letter to Jarvis restricting Plaintiff from exposure to the air in the stations. (Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶¶ 23, 108, 110, 111; Richter Dep., at 140.) Pursuant to Jarvis's order, on a date not specified in the record, Plaintiff returned to work on light duty status. (Pl.'s 56.1 ¶ 109.) He worked for only half a day, however, before leaving work to receive medical attention for knee pain. (Id. ¶ 25.)

The parties agree that it is Chief Jarvis who is authorized to decide whether a firefighter may go on light duty status. (Pl.'s 56.1 ¶ 94.) They agree, further, that absence from work due to an injury caused by work conditions is not a valid basis for a reduction in an employee's performance appraisal. (Pl.'s 56.1 ¶ 95.) Sick leave for employees on light duty status is deducted at a rate of forty hours per week, while sick leave for a full-duty firefighter is taken based on the 24 hours on/48 hours off schedule of a full-duty firefighter. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 96.) Defendants claim

---

[26]     Plaintiff testified that he asked Jarvis why he could not perform inspection work, and that she told him "due to your pursuing and filing an unfair labor charge to protect those jobs, the part-time fire inspector jobs, I can't let you do that." (Richter Dep., at 145.) Plaintiff indicates that this alleged conversation took place "in November when I first was removed by – when I was going on my way to see Dr. Bussell when I had the allergic reaction." (Id.)

the Department's policy requires a full-duty firefighter who is on light duty to use sick leave at his regular duty rate unless he has worked "for a long period of time" or a "significant" amount of time on light duty.[27] (Defs.' 56.1 ¶ 31; Defs.' Opp. 56.1 ¶ 98; Jarvis Dep, at 174-79; Walsh Dep., at 23-26.)

Plaintiff claims the Department's policy does not require a light duty employee to work "for a long period of time on light duty" in order to be eligible to use sick leave at the light duty rate, citing Jarvis's testimony to support his contention. (Pl.'s 56.1 ¶¶ 31-32; Jarvis Dep., at 178-79.) In the cited portion of her testimony, Jarvis stated that this was a Village policy, but acknowledged that she did not know where one could find the policy. (Jarvis Dep., at 178.) She claimed that "[w]e have a number of written policies about sick leave, about light duty . . . and I would be happy to look at those if you want me to." (Id.) When asked whether she believed the light duty policy set forth the length of time an employee must work light duty before he could take sick leave at the light duty rate, she acknowledged that this was "one of those gray areas" that she did not believe was in the policy, but stated that she would have to check because "[t]here may be written memos to that effect." (Id. at 178-79.) Walsh admitted in his deposition that he thought the Village's position on this issue was correct, and that there was no basis for Plaintiff's position in the union contract. (Walsh Dep., at 26.) Neither party has offered any written evidence regarding Village or Department sick leave or light duty policies to support their assertions. The court notes that the CBA addresses the rate at which an employee takes sick leave only in the context of an employee who leaves the Village's employ after twenty years of service as a sworn firefighter. (CBA, at 33.) In that case, the firefighter is paid for twenty percent of unused sick leave hours at his or her "regular straight time hourly rate of pay in effect at [the] time of leaving the Village's employ." (Id.)

The parties agree that Jarvis required Plaintiff to consume his sick time based on the pay

---

[27]     In her deposition testimony, Jarvis stated this period must be at least a week. (Jarvis Dep., at 177-78.)

schedule of a full-duty firefighter, rather than at the light duty rate, for the periods November 16, 2001 to December 6, 2001 and January 2002 through the time of this litigation, and that Jarvis did not consider Plaintiff's reaction to the air in the Department to be a work-related illness. (Pl.'s 56.1 ¶¶ 106, 113; Defs.' Opp. 56.1 ¶¶ 106, 113.) Plaintiff contends that he is entitled to use sick leave at the light duty rate. (Defs.' 56.1 ¶ 28.) Defendants contend that Plaintiff is not entitled to sick leave at the light duty rate because, at the time he left work for knee pain in January 2002, he had spent less than a day on light duty.[28] (Defs.' 56.1 ¶ 98.) Walsh testified in his deposition that, even though he agreed with the Department's position on this issue, he assisted in Plaintiff's grievance questioning the administration's determination that Plaintiff was not entitled to the light duty sick leave rate.[29] (Walsh Dep., at 24-26.)

Brazel stated in his deposition testimony that, at some point (the date is not specified in the

---

[28]    The court notes that this explanation fails to account for the period Plaintiff worked on light duty status prior to November 16, 2001.

[29]    Walsh testified that he and Veitch discussed the issue of Plaintiff's grievance:

[W]e were at different opinions regarding it and the decision was to be made then should we arbitrate it or should we make it a function of a workers' comp. complaint that Mr. Richter had. Mr. Richter advised me that he wanted to make it part of the worker [sic] comp. issue and not to pursue it to the next step in the grievance procedure.

(Walsh Dep., at 24-25.)
     In 2002, Plaintiff and eleven other Village firefighters filed workers' compensation grievances with the Illinois Industrial Commission (the "IIC"), claiming that poor ventilation caused them to fall ill at Station One. Melissa Wrobel, *Village to Appeal Air Quality Case Decision*, DOINGS, May 2, 2003, *available at* http://www.ipfaonline.org/oak%20brook%20fire%20department%20air%20quality%20ruling.htm. On or before May 2, 2003, the IIC ruled in favor of Plaintiff on his workers' compensation claim, determining that he was injured as a result of diesel exposure and disabled because of his exposure, according to his lawyer, Tony Arjuros. (*Id.*) As of May 2, 2003, the IIC had not heard the other eleven cases. (*Id.*) The IIC awarded Plaintiff approximately $20,000 in temporary disability, and the Village has appealed. (*Id.*) The parties agree that the question whether Plaintiff is entitled to take sick leave at the light duty rate was also part of the workers' compensation grievance (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29), but the article does not mention whether the IIC resolved this issue, and the parties have not supplemented their submissions on this issue since May 2, 2003.

record), Jarvis ordered him to separate himself from his friendship with Plaintiff while on the job, but did not ask Brazel to do this with respect to any other firefighters under his supervision, although he did not indicate when this alleged conversation occurred. (Pl.'s 56.1 ¶¶ 92-93; Brazel Dep., at 22-23.) Defendants dispute this contention, claiming that "Chief Jarvis never testified that she ordered Captain Brazel to separate himself from his friendship with Plaintiff while on the job." (Defs.' Opp. 56.1 ¶ 92.)

Veitch stated that Plaintiff had done a "bad job" as union steward because "[h]e doesn't know the law, he doesn't know the process, he doesn't understand the role. . . ." (*Id.* ¶ 61; Veitch Dep., at 52.) Plaintiff avers that Veitch and Crotty "ridiculed" Plaintiff for filing numerous grievances, and that Veitch treated Plaintiff with "disrespect" during grievance meetings, "made fun" of Plaintiff, and told Plaintiff he was wasting Veitch's time with the large number of grievances he had filed. (Pl.'s 56.1 ¶ 64-65, 67.) Defendants dispute this contention. (Defs.' Opp. 56.1 ¶¶ 64-65, 67.)

As of November 15, 2002, the date on which Plaintiff filed his 56.1 Statement, Plaintiff was not working as a full-duty firefighter, nor was he working on light duty. (Defs.' 56.1 ¶ 22; Pl.'s 56.1 ¶ 22; Richter Dep., at 132-33.) Instead, he continued to use his sick leave time at the full-duty rate.[30] (Pl.'s 56.1 ¶ 113; Defs.' Opp. 56.1 ¶ 113.) He contends that he is unable to work due to respiratory problems and chemical exposure suffered as a result of his employment at the Village, supporting this assertion with his own testimony in which he stated that his doctor ordered him not to return to "that exposure and due to my sensitivity, that there are other exposures outside of diesel exhaust that cause my condition now." (Defs.' 56.1 ¶ 26; Richter Dep, at 133.) Plaintiff has offered no medical documentation to support this contention. Defendants have denied Plaintiff's claims that he suffered from significant sinus and respiratory sickness when he was exposed to the

---

[30]     Although the record is silent on the matter, the court assumes that Plaintiff has been on sick leave continuously since January 2002.

19

air in the stations. (Defs.' 56.1 ¶ 27.)

## DISCUSSION

Defendants move for summary judgment on Plaintiff's claims. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003). The court will view all the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court will evaluate whether an employee's speech is protected under the First Amendment using the two-part test established in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). *Wainscott*, 315 F.3d at 848. This analysis requires the court first to determine whether the employee spoke as a citizen upon a matter of public concern. *Id.* If the employee's speech addressed a matter of public concern, the court will balance the employee's interest in bringing the matter to the public's attention and the employer's interest in providing efficient public services. *Id.*

## A.    First Amendment Claim

Plaintiff alleges that Defendants violated 42 U.S.C. § 1983 when they deprived him of his First Amendment rights by retaliating against him for speaking out about air quality at the stations. Defendants assert that Plaintiff's speech was not constitutionally protected, because Plaintiff was speaking as an individual employee regarding internal workplace issues in pursuit of personal interests, rather than as a private citizen regarding a matter of public concern. (Defs.' Mem., at 2-3.) Defendants also urge that Plaintiff suffered no harm as a result of the alleged retaliation. (Defs.' Mem., at 10-11.)

Analysis of a public employee's First Amendment retaliation claim requires the court to consider four elements. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). First, the court considers whether the speech at issue addressed a matter of public concern. *Id.* Next, the court considers whether the employer's interest in the efficient provision of government services outweighed the employee's First Amendment rights. *Williams v. Seniff*, No. 02-1231, 2003 WL 21977039, at *5 (7th Cir. Aug. 20, 2003); *Gustafson*, 290 F.3d at 906. If the court determines under these two steps that the speech in question was constitutionally protected, the plaintiff must prove that "the protected speech was a substantial or motivating factor in the defendant's actions." *Williams*, 2003 WL 21977039, at *5; *Gustafson*, 290 F.3d at 906. If the employee demonstrates that his speech was a substantial or motivating factor in the employer's actions, the employer must prove that it would have taken the employment action even in the absence of the protected speech. *Williams*, 2003 WL 21977039, at *5; *Gustafson*, 290 F.3d at 906.

### 1. Matter of Public Concern

The determination whether the speech at issue addresses a matter of public concern is a question of law for the court. *Snider v. Belvidere Township*, 216 F.3d 616, 620 (7th Cir. 2000). The topic addressed must be of more than mere "public importance." *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999). The court must "delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public." *Id.*, citing *Connick*, 461 U.S. at 147-48. Of these three elements, the content of the speech is the most important consideration. *Williams*, 2003 WL 21977039, at *5. The content of speech is of public concern if it relates to a matter of "political, social, or other concern to the community." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000), quoting *Connick*, 461 U.S. at 146. The form and context of an employee's speech are clarified by an examination of the employee's motivation. *Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir. 2002). The court must ascertain whether the

21

employee's point in speaking was 1) to bring wrongdoing to light, 2) to raise other issues of public concern because they are of public concern, or 3) to further some purely private interest. *Kokkinis*, 185 F.3d at 844.

Plaintiff notes that speech on a topic involving public safety generally involves a matter of great concern to the community. *See Glass v. Dachel*, 2 F.3d 733, 740 (7th Cir. 1993) ("Obviously, speech that focuses . . . ultimately [on] . . . public safety . . . involve[s a] matter of great public concern."); *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) (en banc) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than . . . public safety."). In this case, Plaintiff's statements to his superiors and to outside agencies arguably raised potential threats to the health of shift firefighters who worked–and essentially lived–for 24 hours at a stretch at the stations. If the health of firefighters is threatened, their ability to assist the needs of the community will be jeopardized as well. Defendants attempt to distinguish *Glass* and *Auriemma* on their facts. (Defendants' Reply Memorandum In Support of Their Motion For Summary Judgment (hereinafter "Defs.' Reply Mem."), at 3.) The statements cited *supra* are not limited to the facts of those cases, however, and to the extent the speech at issue related to public safety, it falls into the category of protected speech.

Defendants argue that, even if the content of Plaintiff's speech arguably involved a matter of public interest, it did not implicate a matter of public concern. (Defs.' Mem., at 3.) Indeed, as *Cliff v. Board of School Commissioners of Indianapolis*, cited by Defendants, explained, "The fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [his] remarks on that subject protected." 42 F.3d 403, 410 (7th Cir. 1994) (citations omitted). Defendants also contend that Plaintiff's speech essentially related to a private personnel dispute, rather than an issue in which the public at large would be interested. (Defs.' Mem., at 9.) "A matter is not of public concern if it involves a personal grievance of interest only to the employee." *Wainscott*, 315 F.3d at 849. "Even speech on a subject that would otherwise

be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee or if the only point of the speech was to further some purely private interest." *Gustafson*, 290 F.3d at 908 (citations omitted). Thus, speech that related only to "the effect an employer's action has on the speaker" does not ordinarily implicate the public interest. *Wallscetti v. Fox*, 258 F.3d 662, 667 (7th Cir. 2001). On the other hand, the fact that the speaker's motives contain a "personal aspect" does not require the conclusion that the speech is not protected. *Gustafson*, 290 F.3d at 908 (citations omitted).

Defendants analogize this case to *Wallscetti v. Fox*, where the plaintiff was complaining only about her supervisors' hostility toward her personally, rather than about the effect of the supervisors' behavior on office morale. 258 F.3d at 667. In the *Wallscetti* court's view, plaintiff's "complaints of harassment were more in the nature of a private personnel dispute rather than an issue in which the public at large would be genuinely interested." *Id.* Plaintiff Richter contends he was motivated by concern for the health and safety of firefighters, and for the safety of the community at large, who depend on the health of their firefighters. (Pl.'s Mem., at 3.) Plaintiff has offered sufficient evidence for this court to conclude that both his own welfare and that of his fellow firefighters motivated his efforts. For example, in his December 1998 IDOL complaint, Plaintiff identified himself as the only employee who had filed a grievance or otherwise called the problem to the attention of the employer; however, he also stated his concern that a minimum of 33 employees would suffer potentially adverse effects due to the allegedly poor air quality in the stations. (Pl.'s IDOL Compl., at 2.) Thus, Plaintiff did not speak "solely in terms of his own sensitivity" to the air in the stations. *See Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994). Plaintiff's speech arguably addressed a matter of public concern.

Defendants also argue that Plaintiff's speech was not protected because he did not make his statements in a "public forum." (Defs.' Mem., at 6.) The speaker's choice of forum is important because, unless the speech is made in a public setting, "every employment dispute involving a

23

public agency could be considered a matter of public concern." *Barkoo v. Melby*, 901 F.2d 613, 618 (7th Cir. 1990). Defendants contend that Plaintiff prepared the Department reports for an internal Village audience, namely, Jarvis and Veitch. (Defs.' Mem., at 6.) Without addressing this point, Plaintiff argues that his contacts with non-Department agencies, which were "outside the chain of command and outside the forum of the union grievance procedure" lent a "public air" to his speech. *See Fruin*, 28 F.3d at 652 (finding that plaintiff's "inquiries to the Health Department may have taken on a somewhat more public quality to the extent he sought assistance outside the chain of command"); *Glass*, 2 F.3d at 741 (taking complaints to county district attorney "lends a public air to the form of these complaints") (citation omitted). Plaintiff is arguably correct (and Defendant has not contested the notion) that his contacting outside agencies took on a more public quality or air than merely internal memoranda.

Notably, neither party argues that Plaintiff's speech came within the scope of his employment duties as a firefighter. Defendants nevertheless contend that Plaintiff spoke not as a private citizen, but "as a result of his employment as the Chief Union Steward" for the Department. (Defs.' Mem., at 6.) This argument appears to rest on the assumption that a public employee's speech on matters of public concern loses its protected status if made in the employee's role as a union representative. Defendants do not cite authority for this assumption, but Plaintiff for his part has not challenged it; instead, he argues that his speech exceeded the scope of his duties both as a firefighter and as Chief Union Steward. (Pl.'s Mem., at 5-6.)

The court is unwilling to conclude that a public employee loses the protection of the First Amendment when he is acting on behalf of a union. As noted, Defendant cites no authority in favor of this notion, and the only case law this court located suggests that union activity (particularly, union organizing) is protected, if not as speech, then as association. *See Stagman v. Ryan*, 176 F.3d 986, 999 n.4 (7th Cir. 1999); *Hanover Township Fed'n of Teachers, Local 1954 (AFL-CIO) v. Hanover Cmty. Sch. Corp.*, 457 F.2d 456, 460 (7th Cir. 1972); *cf. Gregorich v. Lund*, 54 F.3d 410,

415 (7th Cir. 1995) (the fact that an employee's expression is union-related "does not automatically render his expression protected"); *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985). Further, in the one case this court located that touches upon the issue, the parties appeared to assume that speech in a public employee's role as union steward is protected speech.[31] *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 970, 973-74 (7th Cir. 2000) (finding that note plaintiff taped onto bulletin board in police station encouraging department personnel to make charitable contributions did not address matter of public concern, although plaintiff contended that she acted in her role as union steward).

Defendants are correct that where a public employee's speech comes in the "routine discharge of an assigned duty," *Delgado*, 282 F.3d at 519, it "will rarely fit the mold of private speech by a citizen" and, thus, will not be entitled to protection, *Gonzalez v. City of Chicago*, 239 F.3d 939, 942 (7th Cir. 2001). In *Gonzalez*, for example, the Court of Appeals held that a civilian police department employee's written reports issued as part of his job duties to investigate public complaints against police officers were not protected speech, since plaintiff wrote the reports in the course of his employment. *Gonzalez*, 239 F.3d at 942.

Defendants argue that, as in the *Gonzalez* case, Plaintiff's speech occurred in "in the course of his employment" duties as Chief Union Steward. (Defs.' Mem., at 5-6.) Whatever Plaintiff's responsibilities as Chief Union Steward may have been, clearly they were not part of his assignments as a firefighter. Even if they were, the court does not believe these circumstances would defeat Plaintiff's claim. Defendants make much of the fact that Plaintiff signed his name as Chief Union Steward and indicated that he was acting as a representative of other workers in his IDOL complaint. (Defs.' Reply Mem., at 3.) Defendants fail to note, however, that *Delgado* clarified the *Gonzalez* requirement, so that what the employee must show is not that his speech occurred

---

[31]    To the extent that Plaintiff believes Defendants took action against him because of his union involvement, he may, of course, have recourse before the Illinois Labor Relations Board.

outside the entire scope of his employment, but only that the speech did not involve the routine discharge of his assigned duties and that he exercised some independent discretion or judgment.[32] In *Delgado*, a police detective argued that his investigative activities and written memorandum regarding alleged criminal activities involving a close associate of the Chief of Police was protected speech. *Delgado*, 282 F.3d at 519. The Court of Appeals agreed, noting that plaintiff wrote the memorandum outside the routine discharge of his assigned duties and that it involved independent discretion or judgment. *Id.* Here, assuming that his union duties are relevant at all, the court concludes Plaintiff may be able to demonstrate that his correspondence involved independent judgment beyond the routine administrative employment duties of a Union Steward.

Defendants cite a number of other decisions in our circuit (none of which addresses the duties of a union steward), but the court finds them distinguishable. In *Youker v. Schoenenberger*, the court held that a letter written by a deputy tax assessor was not entitled to protection since plaintiff wrote the letter on office stationary and affixed it with the Assessor's stamped signature, and since the subject of the letter–identifying fraud in homestead exemptions–was part of his job responsibilities. 22 F.3d 163, 166 (7th Cir. 1994). In the instant case, by contrast, Plaintiff signed his own name and position on his IDOL complaint. In *Egger v. Phillips*, the court found that the plaintiff's speech occurred as part of his official functions as an F.B.I. agent in investigating and reporting his suspicions about a fellow agent. 710 F.2d 292, 315 (7th Cir. 1983), *overruled on other grounds by Feit v. Ward*, 886 F.2d 848, 856 (7th Cir. 1989). Notably, however, in this pre-*Connick* case, the court's reasoning supported its determination not that the plaintiff's speech touched upon matters of public concern (an issue which the court considered in the context of the *Pickering* balancing test), but that defendant's actions were entitled to qualified immunity. *Id.* at 315-23. In *Marquez v. Turnock*, the court noted that the plaintiff's job was to investigate complaints about

---

[32]     The Court of Appeals decided *Delgado* on March 8, 2002, more than six months before Defendants filed their motion for summary judgment.

ambulance services and alleged violations of Emergency Medical Services Division regulations and to make recommendations as to the appropriate response. 967 F.2d 1175, 1176, 1178 (7th Cir. 1992). The court, however, did not decide that the plaintiff's speech criticizing his superior's running of the division did not address a matter of public concern, holding instead that the government employer's interest in the efficient functioning of the division outweighed the plaintiff's interest in making his statements. *Id.* at 1179.

Defendants cite two additional cases in other circuits to support their position, both of which are distinguishable and, again, neither of which discusses the duties of a union steward. In *Koch v. City of Hutchinson*, the court held that a fire marshal's report regarding the cause of a fire was not entitled to First Amendment protection because it "was simply one of many routine official reports which are processed through the City's local governmental agencies on a daily basis." 847 F.2d 1436, 1447 (10th Cir. 1988) (en banc). As discussed *supra*, however, in the instant case, Plaintiff's correspondence was not simply routine official reports processed on a daily basis. In *Stein v. County of Rockland*, the court held that a highway engineer's critical statements of county highway operations were not protected speech because the plaintiff made them "in plaintiff's capacity as a County employee addressing internal Department matters." 95 Civ. 9204, 1997 WL 603826, *2 (S.D.N.Y. Sept. 11, 1997). In the instant case, by contrast, Plaintiff arguably went beyond his capacity as Union Steward in making his statements.

Finally, Defendants contend that Plaintiff's speech regarding air quality at the stations does not constitute a matter of public concern because there was, in fact, no "dangerous air quality" or "unhealthy diesel exhaust" present in the stations. (Defs.' Reply Mem., at 2.) They allege that the Village retained Dimos to conduct independent air quality testing at the stations, and that IDOL reviewed the data and determined the Village was "in compliance with all applicable regulations and standards." (*Id.* at 2-3.) Defendants did not mention this fact in their 56.1 Statement, nor did they offer any supporting evidence in their brief. Even if Defendants had proffered supporting evidence,

27

the mere fact that the stations were tested and found to be safe *after* Plaintiff voiced his concerns would not show that his speech was not a matter of public concern at the time it was uttered. Nor would the fact that the air is not in fact dangerous establish that Plaintiff's speech about the matter was not in good faith.

Plaintiff arguably directed his correspondence toward a matter of public concern.

### 2.    *Pickering* Balancing Test

Once the court determines that the speech in question addressed a matter of public concern, the court must undertake the *Pickering* balancing test. *Kokkinis*, 185 F.3d at 843-44. Resolution of the *Pickering* test is, again, a matter of law for the court. *Wainscott*, 315 F.3d at 851. The *Pickering* test requires the court to decide whether "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern outweigh the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Kokkinis*, 185 F.3d at 844, quoting *Pickering*, 391 U.S. at 568. "The stronger the employee's interest in speaking, the more substantial a showing the state must make to justify a restriction of that speech." *Gustafson*, 290 F.3d at 909 (citation omitted). In *Gustafson*, the Court of Appeals outlined a number of factors for courts to consider in conducing the *Pickering* test:

> *Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [his] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Id.* A government employer need not show that actual problems have occurred in the workplace; rather, it may also consider "the potential disruptiveness" of an employee's speech. *Kokkinis*, 185 F.3d at 845 (citations omitted). The determinations and employment decisions of government

actors responsible for ensuring public safety are entitled to "considerable judicial deference." *Id.* at 845-46 (citations omitted).

In this case, Defendants have not addressed the *Pickering* balancing test in their briefs.[33] Since Defendants have presented no evidence regarding disruptiveness to workplace harmony or discipline, or any of the other *Pickering* factors listed in *Gustafson*, they have not met their burden with regard to this issue. Thus, the court next considers whether Plaintiff's protected speech was a substantial or motivating factor in an adverse employment decision.

### 3. Substantial or Motivating Factor

In order to create a triable issue of fact regarding whether his protected statements constituted a substantial or motivating factor in adverse employment actions, Plaintiff "must produce sufficient evidence for a reasonable factfinder to decide that [the defendants] harbored a retaliatory intent." *Wallscetti*, 258 F.3d at 667-68. As explained above, the parties have presented evidence of a number of incidents during the course of Plaintiff's employment. In his response brief to Defendants' Motion for Summary Judgment, Plaintiff made specific arguments concerning only three distinct adverse actions. (Pl.'s Mem., at 8-11.) The first was the oral reprimand he received from Jarvis in December 1998. (*Id.* at 8-9.) The second was Plaintiff's removal by Jarvis from the Department Safety Committee subsequent to his appointment in January 2000. (*Id.* at 10.) The third was Jarvis's requirement that he use sick leave at the full-duty rate. (*Id.* at 10-11.) Absent any other arguments, the court will limit its analysis to those three matters, as well.

Defendants contend the verbal warning and subsequent written reprimand Plaintiff received

---

[33] Defendants merely stated that "because Plaintiff's reports as Chief Union Steward . . . and as a member of the Fire Department Safety Committee do not involve speech that is a matter of public concern, this court does not need to reach the *Pickering* balancing test." (Defs.' Mem., at 3.) Defendants also contend that Plaintiff's "interest in speaking out does not outweigh the interest of the Village of Oak Brook in efficiently providing Fire Department services." This conclusory statement, without more, does not suffice to carry Defendants' burden here.

(Defs.' Opp. 56.1 ¶¶ 40-46; Defs.' Reply Mem., at 2.) Defendants point out that the court may only consider alleged retaliatory actions that occurred two years prior to May 24, 2001, the date on which Plaintiff filed his complaint in this court. *See Clark v. City of Braidwood*, 318 F.3d 764, 766 (7th Cir. 2003) ("The limitations period for § 1983 in Illinois is two years."). Plaintiff has not argued the matter of limitations, despite having notice of this defense in Defendants' 56.1 Statement, and, thus, effectively concedes this point.

Second, Plaintiff has proffered no evidence to support his claim that Jarvis ordered Brazel to submit a replacement for Plaintiff on the Department Safety Committee because of Plaintiff's protected speech. Plaintiff contends that Jarvis ordered Brazel to replace Plaintiff as the Committee representative "in retaliation for Plaintiff's outspoken efforts to expose air quality problems in the fire stations." (Pl.'s 56.1 ¶ 87.) As support for this contention, Plaintiff points only to his own deposition testimony that his claim about Jarvis's motivation was based only on his "feeling." (Richter Dep., at 58-59.) Plaintiff's own deposition testimony, however, is "insufficient to give rise to an issue of fact" as to whether Jarvis's action was motivated by Plaintiff's speech. *See Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 941 (7th Cir. 1997) (holding that plaintiff's "own subjective and uncorroborated testimony . . . is insufficient to preclude the entry of summary judgment against him"). Plaintiff's speculation as to Jarvis's motives for removing him from the Committee is not sufficient to raise a triable issue of fact.

Finally, Plaintiff argues that his protected speech motivated Jarvis to use his sick leave at the light duty rate following his shoulder injury and again following his shoulder surgery. This matter is more complicated, but the court concludes Plaintiff has not presented evidence that creates a dispute of fact on this issue, either. The parties agree that Jarvis required Plaintiff to consume his sick time based on the pay schedule of a full-duty firefighter, rather than at the light duty rate. (Pl.'s 56.1 ¶¶ 106, 113; Defs.' 56.1 ¶¶ 106, 113.) Defendants claim the Department's policy is that a full-duty firefighter must use sick leave at the regular duty rate, unless he has

policy is that a full-duty firefighter must use sick leave at the regular duty rate, unless he has worked "for a long period of time" or a "significant" amount of time on light duty. (Defs.' 56.1 ¶ 31; Defs.' Opp. 56.1 ¶ 98; Jarvis Dep, at 174-79.) Plaintiff contends that he is entitled to use his sick leave at the light duty rate because the Department's leave policy does not, in fact, contain this timing requirement. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶¶ 31.) Neither party has provided a written copy of the policy regarding sick leave for employees on light duty, but Plaintiff cites Jarvis's admission that she was not certain whether the light duty status policy sets forth the length of time an employee must work light duty before he can take sick leave at the light duty rate, and her acknowledgment that this was "one of those gray areas that I don't believe is in the policy." (Jarvis Dep., at 178-79.) Arguably, this statement might constitute an admission by Jarvis that the sick leave policy imposes no explicit requirement concerning the length of time an employee must serve on light duty. Jarvis's statement does not establish that no such policy existed, as Plaintiff contends. More importantly, neither party has offered any evidence on whether this policy has been applied to other firefighters. Defendants, who arguably have superior access to such information, have offered no evidence concerning the imposition of timing requirements on other firefighters; Plaintiff bears the burden of persuasion to provide evidence showing a genuine issue of material fact as to these issues, however, and there is no suggestion that Plaintiff lacked access to discovery on the matter.

Evidence that employees have been treated more favorably than Plaintiff is most often required in order to establish that the motive for adverse action is retaliatory. Interpreting the federal anti-discrimination statutes, the Court of Appeals has observed that the amount of evidence a plaintiff must establish to create a triable issue of material fact when claiming an adverse employment action was retaliatory "is not susceptible to a general answer." *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), *cert. denied*, 537 U.S. 879 (2002). Where, as in this case, plaintiff does not have "direct evidence" of the defendant's retaliatory

motive, plaintiff will normally need to show that he alone, and not any similarly situated employees who did not engage in protected activity, was subjected to adverse action. *Id.* at 644. As noted, Plaintiff here has not done so.

A plaintiff attempting to demonstrate a retaliatory motive might rely on the fact that adverse action followed his protected activity. As the *Stone* court explained, however, "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Id.* In any event, to establish a causal link using the sequence of events alone, "the employer's adverse action should follow fairly soon after the employee's protected expression." *Franzoni v. Hartmax Corp.*, 300 F.3d 767, 773 (7th Cir. 2002), quoting *Horwitz v. Bd. of Ed. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 613 (7th Cir. 2001). In *Franzoni*, the Court of Appeals held that a six-month gap between the time the plaintiff filed his EEOC charges and the time he was terminated was "too long to establish a causal link without more." *Id.*; *cf. Salvato v. Ill. Dept. of Human Rights*, 155 F.3d 922, 925 (7th Cir. 1998) (six month lapse between filing of EEOC complaint and point at which defendant hired replacement to plaintiff "dooms the argument"); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five months between filing charge of discrimination and discharge "does not by itself suggest a causal link between them"); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four months); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (nearly six months).

These cases involved claims of retaliation for filing claims of discrimination, but the temporal proximity issue is equally relevant in the First Amendment retaliation context. *See Galdikas v. Fagan*, 2003 WL 21949180, *8 (7th Cir. Aug. 15, 2003) (examining temporal proximity of defendants' executive meeting and alleged deprivations of plaintiffs' free speech rights). In this case, the temporal sequence does little to assist Plaintiff in meeting his burden to prove causation. The record reveals that Plaintiff made his last statement regarding firefighter health issues on

November 21, 2000 (11/21/00 Letter to Juskenas, Ex. 42 to Jarvis Dep.), whereas Jarvis forced

Plaintiff to consume sick leave at the full-duty rate beginning on November 16, 2001. (Pl.'s 56.1

¶¶ 106; Defs.' Opp. 56.1 ¶¶ 106.) This lapse is too long to establish a causal link in the absence

of any substantive evidence. Without evidence that another firefighter–or other Village

employee–on temporary light duty was allowed to use sick leave at the light duty rate, there is no

basis on which a reasonable jury could conclude that Plaintiff's memoranda and correspondence

were a substantial or motivating factor in Jarvis's decision regarding his sick leave usage.

Because Plaintiff presents no credible evidence that his protected speech was a substantial

or motivating factor in any of the adverse employment actions visited upon him, Defendants' motion

for summary judgment as to Plaintiff's First Amendment claim will be granted.[34]

## B.     Equal Protection Claim

Plaintiff contends that Defendants violated his equal protection rights under the Fourteenth

Amendment by subjecting him to less favorable terms and conditions in his employment than

similarly situated firefighters. He brings this claim as a "class of one," which is a viable theory

under the Equal Protection Clause of the Fourteenth Amendment. *See Discovery House, Inc. v.*

*Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003), citing *Village of Willowbrook v.*

*Olech*, 528 U.S. 562, 563 (2000). In order to succeed under a "class of one" theory, Plaintiff must

show that he was

> 1) intentionally treated differently from others similarly situated and that there is no
> rational basis for the difference in treatment or 2) that the government is treating
> unequally those individuals who are prima facie identical in all relevant respects,
> and that the cause of the differential treatment is a "totally illegitimate animus
> toward the plaintiff by the defendant."

*Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) (citation omitted).

---

[34]     Because Plaintiff has presented no credible evidence of an improper motive on the
part of Defendants, the court need not decide whether Defendants would have taken the adverse
actions in the absence of Plaintiff's speech, or whether Plaintiff suffered actionable harm.

Plaintiff urges that Defendants were powerful local officials who subjected him to "governmental action wholly impossible to relate to legitimate governmental objectives." (Pl.'s Mem., at 12, citing *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000)). He also contends that Defendants took adverse actions against him because of his position as Chief Union Steward, and that such actions were irrational, arbitrary, and even vindictive. (Pl.'s Mem., at 12.) He further asserts that Jarvis subjected him to "arbitrary discipline, unfounded 'policies', and direct retaliation for filing an unfair labor practice charge against the Village." (*Id.* at13.) He also claims that Veitch's "overt hostility" toward Plaintiff and his decisions in the grievance process constituted harassment affecting Plaintiff alone, and that Veitch's "spiteful and arbitrary treatment of Plaintiff during the grievance process . . . caused Plaintiff to suffer the loss of sick time benefits and adverse performance scores." (*Id.*)

As was true of his First Amendment claim, however, Plaintiff presents no credible evidence to create a triable issue of fact regarding disparate treatment. *Cf. Discovery House*, 319 F.3d at 282 (finding that, despite "boon to" plaintiff of availability of "class of one" theory, there was a lack of evidence of discriminatory intent). Defendants point out, correctly, that Plaintiff has presented no evidence of any similarly situated firefighters or other Village employees who received more favorable treatment than he. (Defs.' Reply Mem., at 4.) Because Plaintiff cites no credible evidence that Defendants have subjected him to disparate treatment compared with similarly situated individuals, Defendants' motion for summary judgment as to Plaintiff's Fourteenth Amendment equal protection claim will be granted, as well.[35]

---

[35]Because Plaintiff has failed to carry his burden regarding his First and Fourteenth Amendment claims, the court need not decide whether Plaintiff is barred from raising the issue of sick leave usage because that claim is properly before the Illinois Industrial Commission or whether Defendants Jarvis and Veitch were entitled to qualified immunity.

## **CONCLUSION**

Although Plaintiff has presented evidence that his speech on safety matters was protected by the First Amendment, he has not presented evidence that creates a triable issue on whether Defendants were motivated by retaliation in taking the adverse action of which he complains here. Defendants' motion for summary judgment (Doc. No. 35-1) is therefore granted.

ENTER:

Dated: September 19, 2003

REBECCA R. PALLMEYER
United States District Judge